**In re Marilyn A. LETSCHE and Paul F. Letsche, Debtors.**

**Bankruptcy No. 98–16268–JNF.**

United States Bankruptcy Court, D. Massachusetts.

April 15, 1999.

Lynne F. Riley, Boston, MA, for Edith Connelly.

Donald J. Bertrand, Watertown, MA, for Debtors.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are 1) the objection to confirmation of the Debtors' Chapter 13 plan filed by Edith Connelly ("Connelly"), Marilyn Letsche's elderly mother, pursuant to which Connelly seeks a finding that the Debtors' Chapter 13 plan was proposed in bad faith, denial of confirmation of the Debtors' proposed Chapter 13 plan and dismissal of the Debtors' Chapter 13 case; and 2) the Debtors' Motion to Avoid Judicial Lien, which judicial lien was obtained by Connelly prior to the filing of the Debtors' Chapter 13 petition. The issues raised by the objection are whether the Debtors filed their Chapter 13 petition and proposed their Chapter 13 plan in good faith. If the Court finds that the Debtors did not propose their Chapter 13 plan in good faith or finds cause for dismissal of their Chapter 13 case because of bad faith, the Motion to Avoid Judicial Lien will be moot.

The Court conducted an evidentiary hearing with respect to Connelly's objection to confirmation on March 10, 1999. At the hearing, Marilyn and Paul Letsche testified. The Court makes the following findings of fact and rulings of law with respect to Connelly's objection to confirmation and motion to dismiss based upon the facts admitted in the Joint Pretrial Statement, the Debtors' testimony, documentary evidence and the record of proceedings in this case.

## II. FACTS

The Debtors filed a voluntary petition under Chapter 13 on June 25, 1998, one week after Connelly levied and suspended execution on a judgment she obtained against the Debtors from the Suffolk Superior Court in the amount of $77,077.70. Connelly obtained the judgment against the Debtors in September of 1997 approximately two months prior to the recordation of a homestead with respect to their residence located at 6 Stanbro Street, Hyde Park, Massachusetts. The judgment, which was issued on September 19, 1997, was accompanied by Findings of Fact and Rulings of Law. In their Joint Pretrial Statement, Connelly and the Debtors agreed to the following with respect to the state court's findings and rulings:

The State Court's Findings include: that Marilyn Letsche unduly influenced Connelly to convey a one half interest in her home to Marilyn Letsche; that Marilyn Letsche, without Connelly's authorization signed reimbursement checks made payable to Connelly and obtained cash by signing Connelly's signature on various checks from Connelly's bank accounts; and that Marilyn Letsche transferred ownership of and/or obtained the cash surrender value of various life and industrial insurance policies by forging Connelly's signature.

\*   \*   \*   \*   \*   \*

The State Court's Findings indicate that the damages for intentional infliction of emotional distress arose from the Debtors' treatment of Connelly after the Debtors' false representations induced Connelly to leave her home of 55 years. In particular, the findings include that once Connelly moved into the Letsche's [sic] home, her contact with the outside world was cut off. The Letsche's [sic] removed the telephone from her room and did not permit her access to theirs. Once when she was attempting to use the telephone, Marilyn Letsche grabbed the phone from her mother's hands with such force that Edith Connelly fell to the floor. Marilyn Letsche told her mother that she would not have any visitors and that she would be "a lonely old lady." After this incident, Edith Connelly made contact with a visiting nurse and requested that she be taken to the hospital. At the time of her

admission to the Faulkner Hospital on August 16, 1996, Edith Connelly was diagnosed as being volume depleted, malnourished, suffering from major depression, psychiatric disorders, chronic pancreatitis, and suffering from chronic abdominal and mouth pain. . . .

Joint Pretrial Statement, ¶¶ 4–5 at pp. 1–2. At the trial conducted on March 10, 1999, the Debtors' counsel conceded that their obligation to Connelly would be nondischargeable under 11 U.S.C. § 523(a) if their case were a case under Chapter 7 of the Bankruptcy Code.

The Debtors filed their Schedules, Statement of Financial Affairs and Chapter 13 plan on July 8, 1998. Approximately two months later, on September 4, 1998, Connelly filed her objection to confirmation of the Debtors' Chapter 13 plan. On September 8, 1998, the Debtors filed an amended Schedule J. On November 2, 1998, the Debtors filed amended Schedules B, C, F, I and J, an amended Statement of Financial Affairs, and an amended Chapter 13 plan. The amended Chapter 13 plan was signed by the Debtors on September 17, 1888, and the amended Statement of Financial Affairs was signed on October 31, 1998. The amended Schedules were not dated and were not accompanied by a declaration signed under pains and penalties of perjury as to their truthfulness and correctness.

The Debtors' original 60–month Chapter 13 plan provided for monthly payments to the Chapter 13 Trustee in the sum of $269.00 and a 15% dividend for unsecured creditors, whose claims, according to the Debtors, totaled $97,014.00, a sum predicated upon the complete avoidance of Connelly's lien. It also was predicated upon the Debtors' Schedules I and J pursuant to which the Debtors disclosed joint monthly income of $2,530.00, joint monthly expenses of $2,168.00 and excess income of $362.00. The Debtors never explained why they were contributing $269.00 per month toward plan payments, rather than

$362.00. The difference of $93.00 per month over 60 months could have increased the dividend to unsecured creditors by 5.75%.

With respect to the total unsecured claims, the Debtors listed the MBTA Credit Union as the holder of a claim in the sum of $2,180.93. On amended Schedule F the Debtors substantially increased the sum owed to the MBTA Credit Union, listing it as the holder of a claim in the amount of $7,412.93.

On their original Schedules the Debtors did not disclose the existence of an MBTA Credit Union share account. Prior to the filing of the Chapter 13 petition, the amount of $310.96 was being deducted from Mr. Letsche's pension check for payment of two unsecured loans from the MBTA Credit Union. According to Mr. Letsche's trial testimony, this sum was being applied to the satisfaction of two pre-petition obligations: a personal loan in the amount of approximately $5,500.00 and a vacation loan in the amount of approximately $2,600.00. After the filing, the MBTA Credit Union began depositing the sum of $396.10 per month into the share account.

On November 2, 1998, after Connelly filed her objection to confirmation of their plan, the Debtors amended their Schedule B to disclose the MBTA share account, as well as a joint account at the Hyde Park Cooperative Bank that Mr. Letsche had with his disabled son. They also amended Schedule F as indicated above, and they amended Schedule I to account for the increased monthly income in the amount of $396.10 that was being deducted from Mr. Letsche's pension prior to the filing of the Bankruptcy petition.

The Debtors, through their amended plan, increased the monthly plan payment to the Chapter 13 Trustee from $362.00 to $646.00, resulting in an increased dividend to unsecured creditors of 20%.[1] The Debt-

---

1. In their amended plan, the Debtors indicat- ed that unsecured claims totaled $104,713.00.

ors commenced making payments to the Chapter 13 trustee in the monthly amount of $646.00 in late October of 1998.

Despite the amendments to the Debtors Schedules, Statement of Financial Affairs and Chapter 13 plan, the Debtors' Schedules remain inadequate and lack integrity. A comparison of the various versions of Schedule J reveal that the Debtors manipulated their expenses.[2] More importantly, at the trial, the Debtors admitted that they failed to list on any version of their Schedules two credit card debts, one to Orchard Bank and the other to First Card, as well as debts arising from pre-petition loans from their children. The Debtors admitted that they continued to make payments on these credit cards after the filing of their Chapter 13 petition. Consistent with the Debtors' failure to list the two credit card obligations, the Debtors' expenses listed on Schedule J do not include expenses for installment payments. Postpe-

tition payments to these credit card companies totaled at least $1,495.00. The full extent of the payments cannot be determined, however, because, despite a subpoena, Mr. Letsche failed to produce all the relevant credit card statements.

At trial, Mr. Letsche testified that he continued to borrow monies from his children and that he repaid the pre- and postpetition loans from sums deposited into the MBTA share account, which sums had been applied prepetition to reduce the outstanding loans from the MBTA Credit Union. During their testimony, neither Mr. or Mrs. Letsche proffered any excuse for failing to list the credit card debts and loans from family members. Additionally, their financial affairs are not complicated in terms of the number of assets and liabilities, or debt structure. Accordingly, the Debtors have no excuse for failing to list their prepetition debts to Orchard Bank and First Card and their children.

2. The Debtors' Schedules J reveal the following:

| Expenses | Schedule J (7/10) | Schedule J(9/8) | Schedule J (1½) |
|---|---|---|---|
| Home Mortgage | $796 | $796 | $796 |
| Electricity and heating fuel | $60 | $60 | $145 |
| Water and sewer | $50 | $50 | $55 |
| Telephone | $53 | $53 | $53 |
| Cablevision | $33 | $33 | $33 |
| Home maintenance | $0 | $0 | $60 |
| Food | $500 | $500 | $555 |
| Clothing | $90 | $90 | $90 |
| Laundry and dry cleaning | $50 | $50 | $50 |
| Medical and dental expenses | $80 | $80 | $80 |
| Transportation (not incl. car payments) | $125 | $165 | $105 |
| Recreation, etc. | $0 | $0 | $90 |
| Charitable contributions | $90 | $90 | $0 |
| Homeowner's insurance | $70 | $70 | $60 |
| Life | $31 | $31 | $32 |
| Health | $0 | $0 | $0 |
| Auto | $75 | $75 | $75 |
| Other | $0 | $0 | $0 |
| Taxes | $0 | $0 | $0 |
| Installment payments | $0 | $0 | $0 |
| Alimony, etc. | $0 | $0 | $0 |
| Payments for dependents | $0 | $0 | $0 |
| Regular expenses from operation of business, etc. | $0 | $0 | $0 |
| Miscellaneous | $65 | $40 (charitable contributions) $65 (misc.) | $0 |
| TOTAL | $2,168 | $2,248 | $2,279 |

## III. DISCUSSION

▮ This Chapter 13 case involves consideration of two sections of the Bankruptcy Code: § 1325(a)(3), which requires that a plan be proposed in good faith, and § 1307(c) which permits the dismissal of a Chapter 13 case for cause. "The burden of proof is upon the debtor to establish confirmation of a good faith plan under § 1325. The burden of proof is upon the objector to show a lack of good faith in the filing of the Chapter 13 petition sufficient to warrant dismissal for cause under § 1307(c)." *In re Ristic,* 142 B.R. 856, 859 (Bankr.E.D.Wis.1992).

▮ Because the Bankruptcy Code does not define the term "good faith," courts have adopted a totality of the circumstances approach to evaluating whether a Chapter 13 plan has been proposed in good faith, and have looked to a variety of factors to assist them in determining the presence or absence of good faith, including the following:

(1) the amount of the proposed payment and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increase in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statement of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) the burden which the plan's administration would place upon the trustee; and

(12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*In re Goddard,* 212 B.R. 233, 240 (D.N.J. 1997) (citing *In re Estus,* 695 F.2d 311, 316 (8th Cir.1982); *Flygare v. Boulden,* 709 F.2d 1344, 1347–48 (10th Cir.1983); *In re Kitchens,* 702 F.2d 885, 888–89 (11th Cir. 1983); *In re Rimgale,* 669 F.2d 426, 432–33 (7th Cir.1982); *In re Goeb,* 675 F.2d 1386 (9th Cir.1982); *In re Norwood,* 178 B.R. 683, 687 n. 6 (Bankr.E.D.Pa.1995)). As the court observed in *Goddard,* these factors were primarily utilized prior to the passage of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). Many of the so-called Estus factors were subsumed by § 1325(b)(1)(B).[3] 212 B.R. at 240. The court in *Goddard,* however, also observed that, after the passage of BAFJA,

the inquiry into whether a Chapter 13 plan was proposed in good faith has taken on a more narrow focus, and now principally concentrates on the following factors: (1) whether the debtor has stated his debts and expenses accurately; (2) whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or (3) whether he has

---

3. Section 1325(b)(1) provides the following:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—...

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1)(B).

unfairly manipulated the Bankruptcy Code.... Moreover, most courts have concluded that, even after BAFJA, a bankruptcy court must look at Estus factors not addressed by the amendments—including that debt sought to be discharged, and the debtor's motivation and sincerity in seeking Chapter 13 relief—to determine whether a debtor proposed his Chapter 13 plan in good faith. 212 B.R. at 240 (citations omitted).[4]

▮ Although Chapter 13 does not contain a good faith requirement with respect to the filing of a Chapter 13 petition, the majority of courts has determined that the absence of good faith is grounds for dismissal. *In re Lilley*, 91 F.3d at 496; *In re Eisen*, 14 F.3d 469, 470 (9th Cir.1994); *In re Gier*, 986 F.2d 1326, 1329–30 (10th Cir. 1993); *In re Love*, 957 F.2d 1350, 1354 (7th Cir.1992). As with the determination of good faith under § 1325(a)(3), courts use a totality of the circumstances test and consider the following non-exhaustive list of factors:

(1) The nature of the debt;

(2) The timing of the petition;

(3) How the debt arose;

(4) The debtor's motive in filing the petition;

(5) How the debtor's actions affected creditors;

(6) The debtor's treatment of creditors both before and after the petition was filed; and

(7) Whether the debtor was forthcoming with the bankruptcy court and the creditors.

*Goddard*, 212 B.R. at 238 (citing *Lilley*, 91 F.3d at 496; *Love*, 957 F.2d at 1357).

▮ "Many, if not all, of the factors which are considered in making a good faith analysis of the plan also apply to a good faith analysis of the petition ... [be-

cause] ... [t]he same underlying policy embodies both good faith evaluations." *Ristic*, 142 B.R. at 859. The Seventh Circuit stated that that policy is the absence of abuse of the provisions, purpose and spirit of Chapter 13. *Rimgale*, 669 F.2d at 431. The only difference in applying these overlapping factors is the burden of proof.

▮ Applying these factors to the instant case, the Court finds that the evidence of bad faith is overwhelming, and there are numerous grounds, not only to sustain Connelly's objection to confirmation of the Debtors' plan, but also to dismiss their Chapter 13 case. Even adopting the view of the Third Circuit and ignoring the nature of the Debtors' obligation to Connelly, namely that it is a nondischargeable debt, the Court finds that the Debtors have failed to meet their burden of establishing that their Chapter 13 plan was proposed in good faith and that Connelly has established grounds for the dismissal of the case.

The Debtors did not state their debts and expenses accurately when they filed their Schedules on July 8, 1998, under the pains and penalties of perjury, and, as the testimony established at the trial, they still have not submitted reliable Schedules. The Debtors' failure to accurately and honestly list all their debts and to disclose all their expenses, including the repayment of undisclosed credit card obligations and loans from family members, fatally undermines the integrity and reliability of their Schedules and compels the conclusion that the Debtors intended to mislead this Court, the Chapter 13 Trustee and their creditors when they proposed their Chapter 13 plans.

In *In re Tully*, 818 F.2d 106, 110 (1st Cir.1987), the United States Court of Appeals for the First Circuit stated that

---

**4.** The court added that the United States Court of Appeals for the Third Circuit has excluded as a factor whether a debt would be nondischargeable in a Chapter 7 case for purposes of dismissal under § 1307(c). *In re*

*Lilley*, 91 F.3d 491 (3d Cir.1996). *Goddard*, 212 B.R. at 240 n. 9. Accordingly, the court determined not to use the dischargeability of a debt as a factor for purposes of § 1325(a)(3). *Id.*

the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. . . . Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

Although *Tully* involved an objection to discharge under § 727(a)(4), the principles articulated by the United States Court of Appeals for the First Circuit are germane to the issues in this Chapter 13 case. Because this case is not a case under Chapter 7, the Debtors cannot be denied a discharge for filing false Schedules. The Court, however, finds that the Debtors have played fast and loose with their Schedules and the Chapter 13 plans predicated upon them. Such a cavalier approach to documents that must be filed under the pains and penalties of perjury compels this Court to find that the Debtors neither filed their Chapter 13 case or proposed their Chapter 13 plans in good faith.

The effect of the Debtors' conduct, had it gone undetected by Connelly, would have been to permit the Debtors to prefer some creditors, specifically, their children and two credit card companies, over their other unsecured creditors, including Connelly, whose lien the Debtors intended to avoid under 11 U.S.C. § 522(f). If the Debtors had disclosed this treatment of unsecured creditors such "unfair discrimination" would have been prohibited by § 1322(b)(1) and would have rendered their amended plan unconfirmable pursuant to § 1325(a)(1), as well as § 1325(a)(3). This Court will not sanction the surreptitious unfair discrimination contemplated by the Debtors' conduct.

## IV. CONCLUSION

Upon consideration of the foregoing, the Court hereby sustains Connelly's objection to the Debtors' Chapter 13 plan and dismisses the Debtors' Chapter 13 case. Accordingly, the Motion to Avoid Lien is moot.